UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ASANTE GAINES, LAHEEM JONES and TYIESE WARREN | Criminal No. 3:20CR126(JBA)<br><br>October 7, 2021 |

### GOVERNMENT'S MOTION *IN LIMINE* TO ADMIT EXCITED UTTERANCE STATEMENTS

The Government respectfully submits this motion *in limine* requesting a ruling pursuant to Rules 803(2) of the Federal Rules of Evidence to permit the introduction of Trevon Wright's and Khalil Heard's statements to responding State of Connecticut judicial marshals immediately after the defendants attempted to murder, and aided and abetted their attempted murder, by shooting both of them in front of the Bridgeport state courthouse at Golden Hill Street.

**BACKGROUND**

Jury selection in this matter is set to begin on November 2, 2021, with evidence to begin on November 8, 2021. Defendants Gaines and Jones are charged with racketeering conspiracy as part of their role in the criminal organization known as the Greene Homes Boyz/Hots ("GHB"), a street gang that controls the Charles F. Greene Homes Housing Project ("Greene Homes") and is allied with the Original North End ("O.N.E.") gang. *See* Dkt. Entry No. 92, Superseding Indictment at ¶ 1. Gaines, Jones and Warren are also named in the January 27, 2020 attempted murder of East End gang members Jaffar Ali, Trevon Wright, Jaheim Warren and Khalil Heard. Id. at ¶¶ 12(f) and are further charged in Counts Two and Four with VCAR Assault with a Dangerous Weapon, VCAR Attempted Murder/Aiding and Abetting, VCAR Conspiracy to

Commit Murder and VCAR Assault with a Dangerous Weapon relating to their role in the January 27, 2020 attempted murders. *Id.* at ¶¶ 13-16, 18-19.

The anticipated evidence to be presented at the trial of these three defendants will establish the following facts, amongst others, which pertain (or as specifically relevant) to the courthouse shooting and the instant motion: On January 27, 2020, at approximately 12:10 p.m., video footage, obtained from inside and outside the state courthouse, shows Jaheim Warren and Trevon Wright, both East End gang members, exit the courthouse and walk to a waiting black 2000 Chevrolet Impala, which was being driven by Khalil Heard with Jaffar Ali in the front passenger seat.

Just as Warren and Wright entered the vehicle, the video captures a gray Subaru Forester pulling up to the victims' car, facing in the opposite direction. Surveillance video shows flashes from multiple firearms being fired from inside the Subaru. Khalil Heard sustained gunshot wounds to his back, shoulder and wrist; Jaffar Ali was grazed in the head and shot in the left thumb; and Jaheim Warren was grazed in the ribs. All three of these victims managed to make their way into the courthouse where they were attended to by judicial marshals until the arrival of EMTs and Bridgeport police officers.

Trevon Wright, who was shot in the side of his chest, fell to the ground outside of the Impala and was unable to move, as he was (and remains) paralyzed from the gun shots he suffered. The vehicle in which the victims had been sitting sustained approximately 23 entry bullet holes in the driver's side and windshield area. Eighteen spent shell casings from two separate firearms (a 9-millimeter and .40 caliber firearm) were located at the crime scene.

Judicial Marshal Loral Quinones was staffing the front door to the courthouse, screening visitors through a metal detector when she saw the shooting take place. Despite the fact that she was unarmed, she ran to the doors to pull the four to five frozen onlookers who were outside to safety inside the courthouse. Khalil Heard ran from the Impala and stumbled into the courthouse, gravely wounded, and Quinones is expected to testify that Heard said that he could not breathe. Judicial Marshal Joshua DeLeon, who had prior medical training, saw blood oozing from Heard's chest and rushed to his side, using a rubber glove to plug the hole in Heard's chest to prevent a collapsed lung. As he did so, he is expected to testify that he heard Heard say, "let me call my sister, I am going to die."

Meanwhile, Warren lay paralyzed next to the Impala when unarmed Judicial Marshal Adrianna Velez spotted him and ran to his aid; Judicial Marshal Kimberly Miller also approached Wright and rendered aid to him. Judicial Marshal Velez is expected to testify that Wright told her that it "feels like I'm going to die," and "call my Mom and tell her I love her." Judicial Marshal Miller is expected to testify that in addition to Wright asking Marshals to call his mother, he also asked her to hold his hand "before something else happens to me."

The Government alleges that defendant Tyiese Warren was one of the defendants who fired at and tried to kill Wright and Heard in the Impala, that Asante Gaines planned and orchestrated the shooting, escape, and cover-up attempt, and that Laheem Jones coordinated with the others and left the courthouse shooting scene to purchase bleach and gasoline, which he used to try to destroy the Subaru from which Warren and co-defendant Marquise Isreal had fired.

I.     ARGUMENT

   A. **Wright's and Heard's statements to Judicial Marshals were excited utterances.**

Under Rule 803(2) of the Federal Rules of Evidence, the normal bar on hearsay testimony does not apply to "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

Excited utterances are admissible because such statements are made "under circumstances that eliminate the possibility of fabrication, coaching, or confabulation, and … therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy and … cross-examination would be superfluous." *Idaho v. Wright*, 497 U.S. 805, 820 (1990). In other words, "the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability." *United States v. Tocco*, 135 F.3d 116, 127 (2d Cir. 1998). The declarant's availability, moreover, is immaterial to whether the exception applies. Fed. R. Evid. 803.

Wright's and Heard's respective statements to the four judicial marshals immediately after the defendants tried to kill them here easily fits within the excited utterance hearsay exception—that is, (1) there was a startling event; (2) the statements were made under the stress of that startling event; and (3) the statements relate to the startling event. *See* Fed. R. Evid. 803(2); *see also Tocco*, 135 F.3d at 127.

*First*, it is clear that the event at issue here was a startling one.  Appellate courts have upheld as startling seeing another person with a firearm. *See United States v. Brown*, 254 F.3d 454, 458 (3d Cir. 2001) (holding that declarant's statement that he saw a man with a gun constituted a Rule 803(2) "startling event"); *Cole v. Tansy*, 926 F.2d 955, 958 (10th Cir. 1991)

(same); see also, e.g., ): *United States v. Abraham*, 386 F.3d 1033, 1037 (11th Cir. 2004) (upholding, under excited utterance exception, admission of 911 call reporting that defendant used a gun to threaten girlfriend's mother and sister) . Of course, the January 27, 2020 VICAR attempted murder was even more startling – Wright and Heard were actually shot, and their respective utterances were made as they feared imminent death and while Wright lay on the street paralyzed from his injury and Heard lay at the courthouse entrance with a rubber glove stuffed into a bullet hole in his chest to prevent his lung from collapsing.

*Second*, it is clear that both Wright and Heard were under stress. Both Mr. Wright and Mr. Heard were bleeding, in pain, and receiving attention for fresh injuries. In fact, Mr. Wright's utterances indicated that he feared he was going to die and under such circumstances, his excited utterances made only moments after the event had transpired, while fearing he would die, provide sufficient assurance that the statements are trustworthy; the same holds true for Mr. Heard's prognostications of his impending death. *See, e.g., United States v. Scarpa*, 913 F.2d 993, 1017 (2d Cir. 1990*); United States v. Bowen*, 511 F. Supp.3d 441, 448 (S.D.N.Y. 2021)("statements made by the victim as he entered the hospital qualify as excited utterances"); *United States v. Delvi*, 275 F.Supp.2d 412, 415 (S.D.N.Y.2003) ("Although the statement was taken from Giles approximately forty minutes after the shooting, the excitement caused by having witnessed the murder of another individual and gotten shot himself had not dissipated. At the time the statement was taken, Giles was still bleeding from his wounds, was being treated by a doctor in a hospital emergency room, and was observed to have been in an excited state. It is hard to believe that Giles could not have been excited less than an hour after having experienced a startling event of the highest order.")(*cited with approval in United States v.*

*Martinez*, 311 Fed. Appx. 378, 381 (2d Cir. 2008); *United States v. Phelps*, 168 F.3d 1048, 1054-55 (8th Cir. 1999).

*Third*, and in a similar vein, there can be no serious dispute that Wright's and Heard's out-of-court statements to the judicial marshals related to the startling event (i.e., being shot multiple times).

Accordingly, the Government respectfully requests that Wright's statements to Judicial Marshals Miller and Velez and Heard's statements to Judicial Marshals DeLeon and Quinones be admitted as excited utterances.

### B.  The statements were non-testimonial

The Supreme Court's Confrontation Clause jurisprudence distinguishes between testimonial statements, made for the purpose of "establish[ing] or prov[ing][ ] events potentially relevant to later criminal prosecution," and non-testimonial statements, which are made for a purpose other than establishing a fact or an event.  In *Davis v. Washington*, the Supreme Court explained that 911 calls are non-testimonial insofar as their purpose is "to enable police assistance to meet an ongoing emergency."  547 U.S. 813, 821-22 (2006).  Although the *Davis* Court left open the possibility that "one might call 911 to provide a narrative report of a crime absent any imminent danger,"—thereby transforming the call into a testimonial statement—it made clear that any call that is, in effect, a "call for help" is non-testimonial, and therefore does not trigger the Sixth Amendment.  *Id.* at 827.

Following this reasoning, the Eighth Circuit ruled in *United States v. Clemmons*, 461 F.3d 1057 (8th Cir. 2006), that statements by a shooting victim to the police at the scene of the shooting were indeed nontestimonial. In *Clemmons*, the police found the victim lying on the

ground "with a pool of blood gathering on his right leg" and "talking on his cell phone in a calm voice." *Id.* at 1058-59.  The police asked the victim to end the call, which he did, and then asked him who had shot him.  The victim identified the shooter and said that the shooter had also stolen a gun from him. *Id.* at 1059. In the Court's view, the victim's statements, which were later admitted at trial against the shooter after the victim was murdered in a separate incident, were not testimonial because "the primary purpose" of the police officer's questions "was to enable him to assess the situation and to meet the needs of the victim." *Id.* at 1060.  Moreover, the officer was concerned that there "could be a party armed" in the vicinity and was trying to "figure out who did this" to the victim. *Id.*  Given that "the purpose of the interrogation was to enable police assistance to meet [an] emergency," the statements were "nontestimonial" and "do not implicate [the] right to confrontation." *Id.*

     Here, neither Wright nor Heard was acting as a witness; both were trying to speak to judicial marshals who were there to "meet an ongoing emergency."  *Davis*, 547 U.S. at 828.  That the respective judicial marshals came after Wright and Heard had already been shot does not detract from the fact that there was an ongoing emergency and the victims were waiting to be transported to the hospital to receive care.  *See Michigan v. Bryant,* 562 U.S. 344, 374 (2011) (explaining that when guns are involved, "[a]n emergency does not last only for the time between when the assailant pulls the trigger and the bullet hits the victim," and that it would be implausible—again, when guns are involved—to "constru[e] the emergency to last only precisely as long as the violent act itself").

## II. CONCLUSION

For the reasons set forth above, the Court should allow Khalil Heard's statements to Judicial Marshals DeLeone and Quinones and Trevon Wright's statements to Judicial Marshals Velez and Miller to be admitted even if Wright and/or Heard does not testify.

Respectfully submitted,

LEONARD C BOYLE
ACTING UNITED STATES ATTORNEY

*s/ Rahul Kale*


RAHUL KALE
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv02526
1000 Lafayette Blvd., 10th Floor
Bridgeport, CT 06604
Tel.: (203) 696-3000


JOCELYN COURTNEY KAOUTZANIS
STEPHANIE LEVICK
ASSISTANT UNITED STATES ATTORNEYS
157 Church Street, 25th Floor
New Haven, CT 06510
(203) 821-3700

CERTIFICATION

I hereby certify that on October 7, 2021, a copy of the foregoing was filed electronically with the court and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

                                              /s/Rahul Kale
                                              RAHUL KALE
                                              ASSISTANT UNITED STATES ATTORNEY